# Doris Rosenfeld, Individually and for Others, Similarly Situated, Appellant, v A. H. Robins Co., Inc., Respondent.

Second Department, July 3, 1978

12

**APPEARANCES OF COUNSEL**

*Lichtenberg & Goss, P. C. (David J. Goss* and *Murray Lichtenberg* of counsel), for appellant.

*Gair, Gair & Conason (Herman Schmertz* of counsel), for respondent.

**OPINION OF THE COURT**

GULOTTA, J.

On this appeal we are called upon to interpret the recently enacted class action statute CPLR article 9 (L 1975, ch 207). The underlying action sounds in products liability and involves an intrauterine device (IUD) known as the Dalkon Shield. The device was manufactured by defendant, A. H. Robins Co., Inc. (A. H. Robins), between 1970 and 1975. Plaintiff, a former user of the Dalkon Shield, alleges that the IUD was defectively designed and that it caused her injury. She further alleges that the defendant breached certain express and implied warranties with regard to the Dalkon Shield. Plaintiff seeks damages on behalf of herself and the class she purports to represent, which class is defined as those New York women who suffered "pelvic infection, uterine abscessing

and/or perforation, and related or incidental hemorrhaging" as a consequence of their use of the Dalkon Shield.

■ Special Term denied plaintiff's application for class action certification, whereupon the instant appeal was taken. The order appealed from should be affirmed.

### THE FACTS

The defendant began marketing the Dalkon Shield during November of 1970, after purchasing the rights to the product in June of 1970 from the Dalkon Corporation which had developed the device. A Dalkon Shield could only be obtained through a licensed physician, who would normally explain to the patient the advantages and disadvantages of using the IUD prior to her making a decision. If the patient then chose to have a Dalkon Shield inserted, the physician would perform certain fitting procedures and insert the device. Product brochures issued by A. H. Robins were distributed to users through their physicians.

As part of its program for marketing the Dalkon Shield, A. H. Robins advertised intensively in medical journals and, in addition thereto, the inventor of the Dalkon Shield, Dr. Hugh J. Davis, undertook to explain the advantages of his IUD in a series of articles which were also published in medical journals. By 1974 the Dalkon Shield was being used by approximately 2.2 million women in the United States, many of whom reside in New York. At that time, however, a series of medical studies began to appear which indicated that the Dalkon Shield was unsafe and ineffective and that it had resulted in an increased incidence of pelvic infection among large numbers of women. Following public criticism and an investigation by the Federal Food and Drug Administration, A. H. Robins permanently suspended distribution of the Dalkon Shield in January, 1975.

Thereafter, more than 670 products liability actions were commenced nationwide against A. H. Robins, more than 150 of those being brought in the Federal courts. Pursuant to section 1407 of title 28 of the United States Code, the Federal actions were consolidated for the purpose of conducting joint, pretrial proceedings (*Matter of Robins Co. "Dalkon Shield" IUD Prods. Liab. Litigation,* 406 F Supp 540 [Jud Pan Mult Lit, 1975]). The Federal panel had concluded (p 542) that joint discovery would be advantageous because of the "commonality of factual issues concerning the design, testing, manufacture, labeling

and inspection of the Dalkon Shield." Many of the State plaintiffs co-operated in this joint Federal discovery, under the leadership of a noted New York attorney, Paul D. Rheingold, the "trustee" of the Dalkon Shield group.

The instant litigation is one of 72 similar actions which have been brought in the New York State courts. Plaintiff suggests, however, that the majority of the prospective plaintiffs have yet to commence any action and estimates that the proposed class she purports to represent may include as many as 2,525 New York women. Plaintiff's bill of particulars alleges that the Dalkon Shield was manufactured without adequate control over the production process and specifies three particular design defects which she contends resulted in pelvic disease, pelvic infection, uterine perforation and other injuries to its users.[1]

On application by the plaintiff for class action certification, the appropriateness of a class action was considered by Madam Justice BURSTEIN at Special Term. She found that to determine the issue of liability as to individual class members would require an inquiry "into the facts and circumstances of each individual case" and, ultimately, that as many as 4,000 additional parties (including physicians and hospitals) would have to be joined. She therefore concluded that plaintiff's purported class failed to satisfy two of the requirements for a class action set forth in CPLR 901:

"2. [that] there are questions of law or fact common to the class which predominate over any questions affecting only individual members; [and]

\*     \*     \*

"5. [that] a class action is superior to other available methods for the fair and efficient adjudication of the controversy."

As a consequence, class action certification was denied.

### THE LAW

This court has never before been called upon to consider the applicability of our revised class action statute in a products liability case.

Our new statute, enacted in 1975, was patterned after rule 23 of the Federal Rules of Civil Procedure and, while the legislative history of our own statute is virtually silent upon

---

1. See the dissenting opinion of SHAPIRO, J., at p 24, *infra*.

this point, it is clear that the framers of Federal rule 23, as amended in 1966, considered class action treatment to be particularly inappropriate in the case of a mass tort or "mass accident" resulting in injuries to numerous persons. (See Advisory Committee Note to the 1966 revision of rule 23, 39 FRD 69, 98.) The commentators, however, have been virtually unanimous in suggesting that the Advisory Committee took an unduly restrictive view of the possibilities of class action treatment in such cases (see, e.g., 3B Moore's Federal Practice, par 23.45 [3], p 23-811, n 35; 7A Wright and Miller, Federal Practice and Procedure, § 1783, pp 116-118), and have indicated time and again that such treatment can and should be considered in an appropriate case. Similar views have been expressed by the commentators on our own article 9 (see McLaughlin, Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR 901:6, p 327; Siegel, New York Practice, § 142, pp 182-183). The thrust of all of these authors is substantially the same, namely, that in a mass tort or mass accident situation, such as a major airplane crash or train wreck, the courts should seriously consider isolating the issue of liability for class action treatment, while allowing the individual determinations on damages to be tried separately thereafter (see CPLR 906). There are, however, important differences between mass torts of the type referred to above and product liability cases such as the case at bar, particularly insofar as the question of causality is concerned. Thus, in the typical mass tort situation, proximate cause can usually be determined on a class-wide basis, since the "cause" of the common disaster will always be identical as to each of the plaintiffs, while contributory negligence on the part of an individual plaintiff is virtually nonexistent.

More directly in point on the present question, two well-known tort attorneys and authors who presently represent a number of Dalkon Shield plaintiffs have considered the feasibility of class action treatment in the products liability area and have been less than enthusiastic in their conclusions. Thus, Alfred S. Julien, who represents plaintiffs in 10 of the New York Dalkon Shield cases, has been critical of the restrictive views taken by the New York Courts in class action cases decided under the prior law (see NYLJ, May 31, 1972, p 1, col 1), but has concluded that personal injury (as opposed to property damage) product liability cases are not amenable to class action treatment in view of the "[d]ifficult questions of

causation and [the] extent of injury" which they present (NYLJ, May 31, 1972, p 6, col 4). The views of Paul D. Rheingold, the trustee of the Dalkon Shield group and counsel for four of the New York plaintiffs, are also pertinent here. Under current law, he has written, "it seems probable that class actions cannot be maintained in products cases involving personal injuries" (3A Frumer and Friedman, Products Liability, § 46A.02[4], p 16A-35). More recently, however, Mr. Rheingold has suggested that the courts "may have adopted too restrictive a view of the role of class action treatment" (3 A.B.A., Litigation, No. 3 [Spring, 1977], pp 18, 21), and has cited with approval the comments of Professor Moore, arguing that there is "much to commend the use of class actions *in certain types* of mass disaster cases" *(id.,* p 21 [emphasis supplied]).

We emphatically agree with our dissenting brother that, although our own statute was patterned after Federal rule 23, we are not constrained to follow the restrictive views of the Federal courts (or the Federal Advisory Committee), on the problem at issue. Indeed, were this a case where the liability issue could be isolated and treated on a class-wide basis (e.g., a typical common disaster or mass tort case), there would be strong reasons for certifying the proposed class, although the question of damage would necessarily have to be left for individual determination. Thus, in the case of an airplane crash, to use the most frequently cited example, it would be possible in many cases to isolate a single causative factor which was responsible for the injury or death of all of the class members. It is clear, however, that in the instant action liability cannot be determined with regard to the entire class. Admittedly, it would be possible to determine several important factual issues on a class basis, including (1) the existence of a defect or defects in the Dalkon Shield, (2) the nature of the representations and warranties made with respect to the device and (3) whether the warranties and representations were false. But assuming, *arguendo,* that these issues were to be decided in plaintiffs' favor, individual determinations would still be required on several "key" issues, among them (1) whether the injuries to individual class members were, in fact, caused by the defect or defects and (2) whether the individual class members detrimentally relied on the false representations or warranties. Moreover, defendant has raised as affirmative defenses the Statute of Limitations and contributory

negligence on the part of the user, neither of which can be determined on a class-wide basis.[2]

The difficulties involved in determining the causality in injuries of this sort cannot be overstated. For example, in *Vincent v Thompson* (50 AD2d 211), this court considered the case of a child who had become ill following the administration of a vaccine known as Quadrigen. An earlier Federal decision had established that the Quadrigen vaccine was, in fact, defective, resulting in serious injuries to the plaintiff in that case. In *Vincent,* plaintiff sought to invoke the doctrine of collateral estoppel based on the Federal decision, but, in an opinion by Mr. Justice SHAPIRO, we rejected plaintiff's argument noting, *inter alia,* that her symptoms had differed from those of the plaintiff in the earlier action. Since it was not apparent that the plaintiff's injury was caused by the defective drug, the issues in the two cases were not identical and collateral estoppel could not properly be invoked.

The same considerations militate against class action treatment in the case at bar. Assuming, for the sake of argument, that in the instant litigation it were to be proved that the Dalkon Shield *had been* defectively designed, it could *not* be inferred therefrom that each and every woman who suffered pelvic or uterine injury following the use of the Dalkon Shield suffered that injury *as a result* of her use of said shield. The injuries *may* have resulted from a variety of factors completely unrelated to the use of the Dalkon Shield, including, perhaps, the peculiarities of her individual physique or the negligent conduct of the user or her physician. The complexities of the causality problem are highlighted by a recent nisi prius decision in California concerning a Dalkon Shield action. In *Askeland v Robins Co.* (Super Ct, Cal, No. 330633, filed Feb. 7, 1978), the court found, after a lengthy trial, that there were factors in plaintiff's background which created a risk of pelvic infection and concluded that plaintiff had not proved that the Dalkon Shield was the cause of her injury. The *Askeland* decision thus illustrates the importance of determining causality on a case-by-case basis.

---

2. A related issue not raised in the present action, where the attending physician has not been joined, but likely to be present in a number of other actions which have already been commenced and which would be included within the proposed class, is the question of possible negligence on the part of the user's doctor in fitting and inserting the device, instructing her on its use, diagnosing possible health problems during their early stages and other related matters.

■ Equally difficult problems arise when plaintiff's breach of warranty claims are considered. According to plaintiff's bill of particulars, defendant's express warranties consisted mainly of advertisements in the various medical journals. Moreover, the factual issues are complicated by the fact that different types of advertisements were printed at various times in various journals. Finally, the representations were not, by and large, made directly to members of the proposed class, but rather to their physicians.

In order to prevail in an action based on representations made in advertising, a plaintiff must prove knowledge of, and reliance upon, the representations alleged *(Randy Knitwear v American Cyanamid Co.,* 11 NY2d 5, 12; *Strauss v Long Is. Sports,* 60 AD2d 501).* Although it has been suggested that a court could determine, on a class-wide basis, whether a given warranty has been breached, leaving the question of reliance and damages to be determined in individual lawsuits (cf. Siegel, New York Practice, § 142, p 182), this court has only recently warned of the difficulties inherent in such an approach and has rejected it *(Strauss v Long Is. Sports, supra).* As the court (per Mr. Justice MARGETT) observed in *Strauss* (60 AD2d 506-507):

"It is true that the language of CPLR 901 (subd a, par 2), which requires that questions of law or fact common to the class must predominate over 'any questions affecting only individual members', clearly indicates an intent that the mere existence of individual questions should not defeat the granting of class status (see 2 Weinstein-Korn-Miller, NY Civ Prac, par 901.08, p 9-31). We are fully aware of the courts' power to sever certain issues while permitting others to be tried as class actions (CPLR 906) and are cognizant of the fact that some commentators have suggested that questions of reliance —particularly in fraud cases—be so severed (see 2 Weinstein-Korn-Miller, NY Civ Prac, par 901.08, p 9-33; see, also, 3B Moore's Fed Prac, par 23.45[2], pp 23-762—23-763). The basic theory behind such severance is that judicial economy might be served by trying common questions in one action (2 Weinstein-Korn-Miller, NY Civ Prac, par 901.08, p 9-33).

"While laudable in theory, the practicality of such severance has been questioned where [as here] individual reliance would not be 'substantially established by the very nature of the proofs on the issue of liability' *(Morris v Burchard,* 51 FRD 530, 536 [SD NY]; see, also, *Tober v Charnita, Inc.,* 58

FRD 74, 84-85 [MD Pa]; *Hoffman v Charnita, Inc.,* 58 FRD 86, 91 [MD Pa]). Certainly, in a case where common exposure to—or reliance upon—alleged misleading advertising cannot be readily inferred, there is no advantage to be gained from permitting the action to proceed as a class action since the proceeding is likely to 'splinter into individual trials' (Comment, Litigating the Antitrust Conspiracy Under Amended Rule 23, 54 Va L Rev 314, 318)."

In *Strauss,* a New York Nets season ticket holder sought to recover the cost of his tickets because the Nets had traded the team's superstar, Julius Erving (Dr. J.) prior to the opening of the 1976-1977 NBA season. Strauss alleged that in deciding to purchase their tickets, he and others had relied on Nets' advertising touting Dr. J. Strauss sought an order declaring his action to be a proper class action on behalf of Nets season ticket holders who had purchased their tickets for the 1976-1977 season subsequent to the first-advertised presence of Julius Erving, but prior to the first public announcement that Erving had been traded, and who bought their tickets, at least in part, because of their expectation that Julius Erving would be playing for the Nets if not injured. We held (reversing Special Term) that neither a class action, nor a partial class action, would be appropriate in that case, stating, *inter alia* (p 507):

"The papers in the record indicate that prior to June 30, 1976, over 2,622 Nets season tickets had been sold. These represented over half of the tickets sold for the entire season. Yet prior to June 30, 1976, newspaper advertising had been published only between June 18 and June 23. The only other advertising before September 19, 1976 was on one day, July 18, 1976. Between July 18, 1976 and September 19, 1976, a period during which there was no newspaper advertising for the Nets' tickets, 761 tickets were sold. On September 21, 1976 Erving first announced that he would not appear at training camp. Thereafter, another 276 tickets were sold.

"Obviously, different factors were at work in each of those periods affecting the motivation of ticket purchasers. Ticket purchasers may have been motivated by the fact that the Nets had won the American Basketball Association championship, or by the fact that they had been admitted to the National Basketball Association and would be playing all of the established teams. Business reasons may have been the dominant motive for the purchases, or the geographical location of the

team may have figured into the decision (pro basketball enthusiasts in Nassau County might have been inclined to buy season tickets to the Nets games rather than travel to Manhattan to see the Knickerbockers). In short, by no stretch of the imagination may one comfortably presume that a majority of season ticket holders purchased in reliance on the Nets' newspaper advertising. Indeed, many season ticket holders may not have even seen defendant's advertisements (see *Edelman v Lee Optical Co.,* 24 Ill App 2d 216)."

Also relevant to this discussion is the opinion of the Appellate Division, First Judicial Department, in *Ross v Amrep Corp.* (57 AD2d 99), in which the plaintiff sought to certify as a class persons who had relied upon various false representations in purchasing land from the defendant. The court (per Mr. Justice SILVERMAN) noted, *inter alia* (p 103), that "the falsity of each of these representations is a common question with respect to those purchasers to whom the *particular* misrepresentation was made. But we do not think that on this complaint those common questions can fairly be said to predominate" (emphasis supplied).

In view of the complicated issues of fact which must be resolved on an individual basis, it is our opinion that common questions of law and fact do not predominate in this action and that Special Term correctly denied plaintiff's motion for class action certification. Nor do we find this to be a proper case for a partial class action certification pursuant to CPLR 906. While some factual issues could perhaps be resolved in a class action format, these issues are thoroughly intertwined with those which must be determined individually. Furthermore, in view of the limited scope of the issues which can be resolved on a class-wide basis, the judicial economy to be reaped and the advantages for litigants of a partial class action will be relatively small. It should be noted, in this regard, that many Dalkon Shield plaintiffs will not be required to bear the full expense of litigating their claims on an individual basis. Some have already taken advantage of the joint discovery in the consolidated Federal pretrial proceedings by joining the "Dalkon Shield" group,[3] while others,

---

**3.** The Dalkon Shield group is a voluntary association of plaintiffs' attorneys which was organized in 1974 when the number of Dalkon Shield cases pending around the country became apparent. Mr. Rheingold, the trustee of the group, has described its activities as follows (3 A.B.A. Litigation, No. 3 [Spring, 1977], 18-19):

"Members joining the Dalkon Shield group pay $200 and receive a background

perhaps, will be able to invoke the doctrine of collateral estoppel, and thus be spared the expense of relitigating previously decided issues (but, see, *Vincent v Thompson,* 50 AD2d 211, *supra*).

Accordingly, the order appealed from should be affirmed.

SHAPIRO, J. (dissenting). This court is affirming an order of Special Term which denied plaintiff's motion for either plenary or partial class action certification and required her to amend her complaint to delete all class action allegations therefrom. I would reverse and grant plaintiff's motion to the extent of determining that this action may be conducted partially as a class action in accordance with the provisions of CPLR 906, and I would remand the matter to Special Term for further proceedings pursuant to CPLR article 9.

### QUESTION PRESENTED

Did Special Term correctly refuse to certify this case as a plenary or partial class action?

package of data containing sample pleadings, answered interrogatories, medical articles, and governmental publications. They also receive periodic newsletters covering trials, settlements, new medical and administrative developments, group dealings with defense counsel, and the availability of experts. * * *

"About 250 lawyers or law firms are currently participating in the Dalkon Shield group's activities. They come from forty-six states and Canada, and together represent perhaps 500 plaintiffs. * * *

"One outstanding feature of the Dalkon Shield group has been its arrangement with national counsel for the manufacturer to hold one set of depositions and documentary discovery and to apply that discovery package to all participating cases, even those filed after the agreement was reached. These arrangements grew out of an initial contract in 1975 between the trustee of the plaintiffs' group and the national counsel for the defendant manufacturer. After numerous drafts, revisions and meetings, the parties finally signed an agreement in June, 1976, covering many pretrial matters.

"The discovery plan, which runs seventeen single-spaced pages, provides for three types of discovery by the plaintiff's group: (1) inspection of the defendant's files (more than 100,000 documents) and copying of pertinent records (reduced to a 'trustee's package,' the documents in the package are marked by the defendant, making a copy an 'original' for trial purposes); (2) a master set of interrogatories; (3) depositions of many employees of the defendant and a limited number of other persons, including the inventors and investigators. Many provisions of the Federal Rules of Civil Procedure and the Federal Rules of Evidence have been incorporated into the plan, even though the plan applies primarily to State court cases.

"This discovery, when done, will apply to every Dalkon Shield case then participating in or afterward added to the plan. Each participating case will be assessed its proportionate share of the total costs of discovery, including the time of the attorney who takes the discovery for the group. The current rough estimate of the per-case cost is less than $500."

### THE FACTS

This case is one of more than 670 cases which have been brought nationwide against the defendant, A. H. Robins Co., Inc. (Robins), alleging personal injuries brought about as a result of the use of a contraceptive intrauterine device (IUD) sold by it and known as the Dalkon Shield. It was clinically tested from September, 1968 to November, 1969; it was then supplied commercially to the medical profession by the Dalkon Corporation. On June 12, 1970 Robins, a manufacturer and distributor of pharmaceuticals and other products, acquired all rights to the Dalkon Shield. Robins initiated its own program to test the product and began to market it. Between June 12, 1970 and June 28, 1974, approximately 2.2 million Dalkon Shields were inserted in women in the United States. On the latter date, Robins voluntarily suspended distribution of the shield.

A Dalkon Shield could be inserted only by a physician, who normally obtained the device from a surgical supply house. Each Dalkon Shield package contained labeling instructions and materials that described its advantages and disadvantages. It was the physician's responsibility to explain to the prospective wearer these advantages and disadvantages and, if the decision was made to have the Dalkon Shield inserted, to perform certain preliminary fitting procedures outlined in the labeling instructions.

There is evidence to suggest that use of the shield has resulted in a wide variety of injuries to users, including unwanted pregnancies, septic abortions, uterine perforation, hemorrhage, inflammation and various forms of pelvic infection.

Plaintiff, Doris Rosenfeld, purchased a Dalkon Shield on or about September 1, 1972 and had it implanted by her gynecologist. In March, 1975 plaintiff was admitted to a hospital and treated for uterine infection, uterine abscessing and related bleeding. She alleges that these injuries resulted from her use of the IUD. As a result of these injuries, it became necessary for plaintiff to undergo a hysterectomy in April, 1975.

The complaint alleges that the shield was defectively designed and that the defendant misrepresented its safety and suitability in its advertisements and catalogues. Certification of the following limited class was sought: "All patients of gynecologists or of clinics under the supervision of gynecolo-

gists within the State of New York in whom Defendant's IUD's were implanted, during the time period June 12, 1970 (the date on which ROBINS acquired the patents on the IUD at issue) through June 28, 1974 (the date upon which Defendant first withdrew the subject IUD from public marketing) and which patients' IUD's malfunctioned, failed or operated in such a manner, during the time period June 12, 1970 through November 23, 1976 (the date of service of Plaintiff's Complaint), so as to require their hospitalization for treatment of maladies or other physical manifestations which had as symptoms thereof all forms of pelvic infection, uterine abscessing and/or perforation, and related or incidental hemorrhaging."

This class, the parties agree, may include as many as 2,525 women.

### THE FEDERAL LITIGATION

More than 150 of the Dalkon Shield cases were brought in Federal district courts. Those cases were consolidated (pursuant to the provisions of section 1407 of title 28 of the United States Code) for the purpose of conducting co-ordinated pre-trial proceedings (Matter of Robins Co. "Dalkon Shield" IUD Prods. Liab. Litigation, 406 F Supp 540 [Jud Pan Mult Lit, 1975]).[1] The decision granting consolidation stated (p 542) that "[a]lthough we recognize that the actions differ in certain respects, an analysis of the complaints reveals a commonality of factual issues concerning the design, testing, manufacture, labeling and inspection of the Dalkon Shield." Some State court plaintiffs co-operated informally in the resultant joint discovery proceedings. Thereafter, counsel in the State actions agreed to participate in the unified pretrial proceedings. As a result, one set of depositions and discovery documents were taken in all of the participating cases.

### LITIGATION IN NEW YORK STATE

Seventy-two Dalkon Shield cases have been brought in the New York State courts. Seventeen have been settled, leaving a total of 55 cases still pending. Defendant's counsel on this motion represents or has represented it on five of the settled cases and 48 pending cases. In those 53 cases, 77 physicians

---

1. Under section 1407 a Judicial Panel on Multi-District Litigation is created. That panel is authorized to transfer related civil actions, pending in different Federal district courts to one district for co-ordinated or consolidated pretrial proceedings.

have been joined, either as primary parties or on cross claims. Apparently, this is the only State case in which there has been a motion for class action certification.

## PLAINTIFF'S CONTENTIONS

Plaintiff's bill of particulars alleges, *inter alia,* that the device was defectively molded of an overrigid substance which had "an inherent and latent dangerous tendency to cause a shearing between the endometrium and the chonioamnion" which, in many cases, resulted in a type of bleeding which required hospitalization; further, because of its alleged defective design, the device tended to erode causing perforation of the uterine wall and this, too, often required hospitalization. It was allegedly further defective for its unique design of a single tail with bundled monofilaments enclosed within a tin plastic sheath in which the tail became a collection point for harmful bacteria resulting in infections. Overall (it is alleged), about 27% of the women who were hospitalized required surgery.

It is plaintiff's position that the impropriety of design and the misleading literature prepared and distributed by defendant are common issues which call for disposition under the recently liberalized New York statutes for class actions, or at least for an action conducted *partially* as a class action as to those issues. Plaintiff's motion papers allege that plaintiff is qualified as a proper representative of a duly constituted class and that she complies with the requisites of CPLR 901.

CPLR 901 (subd a) states:

"One or more members of a class may sue or be sued as representative parties on behalf of all if:

"1. the class is so numerous that joinder of all members, whether otherwise required or permitted, is impracticable;

"2. there are questions of law or fact common to the class which predominate over any questions affecting only individual members;

"3. the claims or defenses of the representative parties are typical of the claims or defenses of the class;

"4. the representative parties will fairly and adequately protect the interests of the class; and

"5. a class action is superior to other available methods for the fair and efficient adjudication of the controversy."

## DEFENDANT'S CONTENTIONS

Defendant argues that the issues involved in the various actions are so diverse that to make any aspect a class action would be totally impracticable. Those issues, it says, constitute "a ludicrous, unthinkable array" which would make a "sheer insanity of class certification". It did not so contend, however, when some of the plaintiffs in the suits against it sought individual pretrial examinations.[2]

Further, and with reference, in general, to "mass torts", defendant points out that the progenitor of CPLR article 9 was rule 23 of the Federal Rules of Civil Procedure. In that connection, it cites the Advisory Committee Note to the 1966 revision of rule 23, which stated (as reprinted in 39 FRD 98, 103): "A 'mass accident' resulting in injuries to numerous persons is ordinarily not appropriate for a class action because of the likelihood that significant questions, not only of damages but of liability and defenses to liability, would be present, affecting the individuals in different ways. In these circumstances an action conducted nominally as a class action would

2. In the Federal litigation, defendant argued for common disclosure proceedings against it because of the commonality of the factual issues, and the Judicial Panel held *(Matter of Robins Co. "Dalkon Shield" IUD Prods. Liab. Litigation,* 406 F Supp 540, 541-542, *supra):*

"[E]very action shares common factual issues relating to what [Robins] * * * did or did not do, knew or did not know and told or did not tell with respect to the design, testing, manufacture, inspection, distribution, promotion and labeling of the Dalkon Shield. [The cases should be consolidated to] * * * eliminate the possiblity of duplicative discovery and conflicting pretrial rulings * * * [T]he net savings to [the] many parties and the courts more than offsets any inconvenience[.] * * *

"Although we recognize that the actions differ in certain respects, an analysis of the complaints reveals a commonality of factual issues concerning the design, testing, manufacture, labeling and inspection of the Dalkon Shield."

Further, defendant, in a later proceeding before the panel and in answer to an allegation that possible medical malpractice by certain physicians who had inserted the Dalkon Shield deprived the cases of the feature of commonality, stated: "[T]he underlying facts upon which plaintiff predicates [her] claim for relief are common to other Dalkon Shield actions * * * The presence of the petitioning physicians * * * does not * * * alter or destroy the common factual denominator."

The court *(Matter of Robins Co. "Dalkon Shield" IUD Prods. Liab. Litigation,* 419 F Supp 710, 712), in overruling the contentions against commonality, said: "These arguments are not persuasive. In our earlier opinion, we recognized that the actions in this litigation vary in certain respects, including the nature of the injuries suffered, disparate legal theories and the presence of different defendants. See *In re A. H. Robins Co., Inc., supra,* 406 F.Supp. at 542. An analysis of the complaints in the above-captioned actions, however, demonstrates that each action shares the same factual questions concerning the design, testing, manufacture, labeling and inspection of the Dalkon Shield that predominated in the previously transferred actions."

degenerate in practice into multiple lawsuits separately tried."[3]

## THE DECISION OF SPECIAL TERM

The learned Justice at Special Term acknowledged that there were "questions of fact and law common to all members of the proposed class", but she opined that the granting of class status would mean that "the trier of fact would be required to inquire into the facts and circumstances of each individual case [and therefore] [t]he result of such an inquiry would be the *de facto* conduct of multiple fact trials within the framework of the primary class action." She thus concluded that the "questions of law and fact common to the members of the proposed class do not outweigh or predominate over the myriad foreseeable questions that are personal and individual to each member of the class." She then noted the different stages of the 72 pending actions against defendant in New York State and noted that 97 additional parties (such as physicians, hospitals, etc.) were parties defendant in the cases still pending. She added that projecting these statistics to the "approximately 2,525 Dalkon-Shield related injuries in this State concerning which suit has not yet been commenced" would cause approximately 4,000 additional parties ultimately to be added. In denying plaintiff's motion the court finally said that "such uncertainty and speculation militates against the required showing that a class action would be superior to other available methods for the fair and efficient adjudication of the controversy (CPLR § 901 [a][5])."

In coming to that conclusion, however, the court apparently did not consider the appropriateness of partial class action certification under CPLR 906. That section states:

"When appropriate,

"1. an action may be brought or maintained as a class action with respect to particular issues, or

"2. a class may be divided into subclasses and each subclass treated as a class.

---

3. Despite that note, whether Federal Rule 23 is appropriate for use in mass torts cases is still an open question in the Federal courts (see The Class Action Conflict A 1976 Report by Judge WILLIAM H. BECKER, Chief Judge of the United States District Court of the Western District of Missouri, 75 FRD 167, 187-188; Ann. 28 ALR Fed 719).

"The provisions of this article shall then be construed and applied accordingly."

## THE LAW

In 1960, 15 years prior to the enactment of the liberalized class action statute in this State, Professor (now Judge) JACK B. WEINSTEIN, in an article in the Buffalo Law Review (vol 9, p 469) decried the applicability of class action suits to mass tort actions, saying: "Theoretically, the [liberalized class action] rule proposed in this paper for New York, providing a traditional class action which binds the class whether the decision is favorable or unfavorable, could be utilized in negligence cases. There are, however, serious objections to using class actions where an accident has resulted in injury to many persons. The economics of the contingent fee in tort litigation —and settlement practices of public insurers and self-insurers —today insures effective legal service for any injured person who wants a lawyer. Permitting a class action would create an unseemly rush to bring the first case and provide, through notice to all injured persons, a kind of legalized ambulance chasing. As a matter of practice, disasters usually do not result in a large number of separate trials. Cases are referred to specialist attorneys who represent a number of parties, actions are consolidated, and settlement negotiations dispose of most claims. Where insurance coverage and assets of the defendant are less than prospective recoveries, the pressure to cooperate in settlement negotiations is too great to resist. Both the plaintiff's bar and defendant's bar in the negligence field are so closely knit that, as a practical matter, they can informally provide most of the advantages of class actions."

The views then expressed by Judge WEINSTEIN may possibly not be the same today, particularly in view of the larger compass of the New York statute (see 2 Weinstein-Korn-Miller, NY Civ Prac, par 906.02). Regardless of that fact, however, I believe that the facts in this case clearly call for partial class action certification under CPLR 906 and would even be proper under the Federal class action statute.

As stated at Ann. 28 ALR Fed 719, 722-723: "Despite the Advisory Committee's view of Rule 23 in the case of mass accidents, responsible commentators have not hesitated to take a directly contrary view. (See 3B Moore, Federal Practice ¶ 23.45[3]; 7A Wright & Miller, Federal Practice & Procedure: Civil § 1783.) Nor have the courts been awed by the Advisory

Committee's comment * * * For example, the court in Hernandez v The Motor Vessel Skyward (1973, DC Fla) 61 FRD 558, affd without op (CA5 Fla) 507 F2d 1278, 1279, noting the Advisory Committe comment, said that upon closer scrutiny it was apparent that the approach taken in some cases' and urged by the commentators was consistent with the intent of the draftsmen of Rule 23, although a class action determination that would encompass the issues of negligence, proximate cause, and damages would rarely be adequate in a mass tort. However, the court went on, if the application of the technique is limited to those issues in which uniformity of result is certain, the Rule retains its viablity, even in a mass accident setting. *That is, the court explained, issues such as proximate cause and negligence must be subject to a clear-cut determination before a class action can be maintained on those issues, but when such a clear-cut determination can be made, a class action is appropriate."* (Emphasis supplied.)

In Wright and Miller, Federal Practice and Procedure (vol 7A, § 1783, pp 116-118), in rejecting the views expressed in the afore-mentioned Advisory Committee Note, the authors say (pp 116-118):

"in many ways Rule 23(b)(3) seems particularly appropriate for some tort cases of this type [i.e., mass torts]. The central issues of liability, for example, may be a different one that occasionally will require lengthy expert testimony, perhaps concerning * * * the state of a technological art in a particular field of * * * manufacturing. If the various tort claims were tried individually, the evidence would have to be repeated time and time again * * * Absent other considerations, it seems wasteful to relitigate the same liability issue in different actions and before different courts.

"Indeed, the fact that damages may raise highly individual issues * * * should not always require the disallowance of a class action. Federal courts have held separate trials on the question of damages in other types of actions, for example, in the antitrust and securities fields. *There is no reason to apply more stringent requirements in Rule 23(b)(3) cases involving mass accidents, as long as the liability issue is common to the class. Thus, in an appropriate case the court should invoke Rule 23(c)(4)(A) to limit the class suit to the question of liability."* (Emphasis supplied.)

In a recent article entitled Dealing with Disasters: Some Thoughts on the adequacy of the Legal System, by Professor

Robert L. Rabin (30 Stanford L Rev 281, 295), it is stated: "Consider, for example, the cost of preparing for litigation. Stern's law firm alone incurred almost $500,000 in expenses before the case was settled, without taking on the substantial costs of litigation or billing any attorney's fees. Obviously, one cannot regard this staggering sum entirely apart from the disaster context—mass depositions and extensive psychiatric consultations, for example, are not common to all accident litigation. *But even for a single badly injured plaintiff, the preparation of a complex products liability or medical malpractice case is an extremely expensive undertaking.* However much plaintiffs stand to recover, if * * * a successful outcome is highly speculative and the victims are destitute, these substantial fixed costs may be insurmountable barriers to effective representation." (Emphasis supplied.)

There is no indication that CPLR article 9 was intended by the Legislature to be a slavish adoption of Federal rule 23 (the effect of which, as indicated, has not been to rule out its applicability to mass torts). Clearly, the application of CPLR article 9 to actions pending in the New York State courts would be far less cumbersome than the application of class action status under the Federal rule which would necessarily include residents of different states. In actions pending in this State there are no problems of diversity of citizenship or jurisdictional minimum and no choice-of-law questions. Those problems are encountered in the Federal courts.

I have sent for and examined the legislative bill jacket dealing with the adoption of CPLR article 9. It reveals no commentary indicating that its provisions were intended to exclude mass torts.[4] Since the enactment of article 9, leading New York practice commentators have pointed out the special applicability of its provisions in dealing with liability issues in a partial class action. Thus, Professor McLaughlin, in his commentaries to CPLR article 9, although prefacing his remarks with the statement that "[i]t would be an unusual 'mass accident' case that would qualify for class action treatment", concludes that *"it would not be amiss to consider*

---

4. The only reference in the legislative bill jacket to mass torts per se is in a memorandum from the State Consumer Protection Board addressed to the Counsel to the Governor, dated May 29, 1975, which states: "Class actions are useful in a wide variety of legal contexts, including environmental litigation, civil rights and civil liberties cases, labor law actions, antitrust suits, stock fraud cases *and mass torts."* (Emphasis supplied.)

*isolating the liability issue for such treatment.* See CPLR 906" (McLaughlin, Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, C901:6, p 327 [emphasis supplied]). Further on in his commentary, he points out (C906:1, p 345) that: "Modeled on Federal Rule 23(c)(4), this section [CPLR 906] permits isolation of separate issues for class action treatment. Thus, in a mass tort, *e.g.,* an airplane collision, the liability could be determined in a class action under this section, and the damages could then be tried individually. But see C901:6. *This may prove to be the most important section in the new class action article."* (Emphasis supplied.)

In Weinstein-Korn-Miller, New York Civil Practice (and despite the caveat of Judge WEINSTEIN's 1960 commentary at 9 Buffalo L Rev 469, quoted above), it is stated (vol 2, par 906:02):

"However, under the more functional approach of Article 9 [as compared to the prior class action provision of CPLR 1005] it would seem possible for the New York courts to follow suggestions made with reference to the federal rule and bifurcate the trial, *proceeding first to a trial on the common elements of liability and then require each class member to prove individual reliance and the amount of damages.*

\*     \*     \*

"The procedure of the bifurcated trial is not unknown to the New York courts, being frequently used in negligence actions to first determine the issue of liability and then damages.

\*     \*     \*

"Following the procedure available to a fraud action, it might also be possible to permit a partial class action on the issue of liability in an action arising out of a mass accident, for example, a plane crash. It seems obvious that in such a situation, the liability of the defendant would be identical to each injured person and could be tried at one time and then, after an affirmative determination of liability, each member of the class would be permitted to prove individual damages. *In this way the possibility not only of multiple litigation but of multiple determinations may be avoided."* (Emphasis supplied.)

The latest and most authoritative comment on the New York class action statute is that of Professor David D. Siegel in New York Practice (§§ 140-141, pp 177-180):

"The judicially-imposed barrier to the use of class actions

seeking money was legislatively removed with the adoption of CPLR Article 9 in 1975.

\* \* \*

"Since CPLR 901(a) is intentionally phrased 'in pragmatic and functional terms avoiding any reference to the abstract nature of the substantive rights involved', it contains no limitation based on the kind of substantive claim asserted. It has no stated preference for one kind of claim against another, presumably making itself available to any as long as the list of CPLR 901(a) requirements is met.

\* \* \*

"*We have here another sui generis realm, but, with the obvious support that Article 9 gives the class action, the courts' examination of the prerequisites in each individual case should at least be divested of its traditional hostility.*

\* \* \*

"*The class need not have a common interest in all of the issues, CPLR 901(a)(2) makes this clear when it requires that common issues 'predominate' rather than preempt. If it appears that there are several common issues but one predominates for one part of the class and another for a different but substantial segment of the class, the class may be divided into 'subclasses and each subclass treated as a class'.* So, for example, if a defendant, in furtherance of a commercial scheme, issues two fraudulent documents (such as prospectuses or offerings), large numbers relying on each to their detriment, a class action need not be disallowed merely because two issues (the fraud of each document) predominate. The court could order a severance, making separate class actions of the two groups, but it would have discretion to keep the case as one with 'subclass' treatment.

"It is not of great moment that damages may differ individually among the various members of the class, numerous though they be. The court can allow class status for the purpose of trying the common issue and then, through various discretionary alternatives, set up a mechanism whereby each class member individually proves his damages. Indeed, there is explicit authority to bring the class action to try only a particular issue rather than all issues. *So, for example, a class action can be brought only to establish the fraudulence of a document relied on by many; the many are then left to bring separate actions to test the individual elements of reliance*

*and damages if the class action establishes the fraud.* In those later actions, the fraud issue will be the subject of a collateral estoppel and thus the class action will have well served its purpose.

*     *     *

"Any device which would allow one action to do a job, or a good part of it, that would otherwise have to be done by many, must be considered 'superior' in a state which is as pro-consolidation as New York is: were all the potential class members to bring separate actions, the common issue would itself permit consolidation of all of them and the courts would be almost certain to grant it. This is not to say that class status is permissible whenever, were each class member to bring separate suit, consolidation could ensue. It is only to stress that as far as CPLR 901(a)(5) is concerned, New York does deem one action a 'superior' way to adjudicate multiple claims. To that extent the analogy is compelling." (Emphasis supplied.)

The facts in this case call for enucleation of the issues of defective design and failure to warn because the proof of liability here involves sophisticated evidence that the device was indeed inherently defective. We would be naive indeed if we did not take cognizance of the fact that the amassing of such proof and the obtainment of expert witnesses are enormously expensive and may be more than any one individual lawsuit can profitably stand. In that vein I note Governor Carey's memorandum in signing article 9 into law (NY Legis Ann, 1975, p 426): "In many instances, an individual's own damages resulting from a pattern of illegal behavior by another may not be sufficient to justify the costs of litigation although the aggregate damages of all others similarly injured by the illegal behavior certainly would. Under present law, unless the individual thus injured is willing and able to press his legal claim as a matter of principle despite the financial loss, there is no economic deterrent to poor workmanship, deceptive or unconscionable trade practices and illegal conduct."

The intent, pregnant in that commentary, is broad enough to include personal injury actions of the same type where the cost of proof in an individual case might readily exceed any possible recovery. (See Rabin, 30 Stanford L Rev 295.) That that is the case here is made more than crystal clear when we note that among other things, Robins has agreed that more

than 100,000 of its documents will have to be examined to properly prepare a plaintiff's case for trial (see n 3 of the majority opinion).

The enactment of CPLR 906 has made available a machinery for the fair and expeditious disposition of mass litigation. It should be given a construction which is consonant with its broad wording and apparent intent and avoids what happened in the MER/29 lawsuits. MER/29 was a prescription drug designed to lower body cholesterol, but which, upon use, caused cataracts, hair loss, etc. There, approximately 5,000 people were injured by the use of the drug, *and 1,500 lawsuits* were filed (Rheingold, The MER/29 Story—An Instance of Successful Mass Disaster Litigation, 56 Cal L Rev 116). Where such mass litigation can be avoided it should be, and CPLR 906 is ideally suited for that purpose. The rule is simply a device to make adjudications more efficient by aggregating instances of similar litigation—a principle not at all revolutionary—and it should not be hobbled by a narrow construction of its intended purposes (see, in this connection, the comprehensive opinion by BLOOM, J., in *Gilman v Merrill Lynch, Pierce, Fenner & Smith* (93 Misc 2d 941).

While the issues pertaining to individual cases are too diverse and complex for treatment in an overall class action, the issues of defective design and failure to warn are severable and common to all actions and are, therefore, appropriate for determination in a partial class action. Such a partial certification would serve to protect the more than 2,500 New York State class members who have not pursued individual actions against this defendant and thus the provisions of CPLR 906 would be utilized for one of its enlightened purposes.

The majority apparently accepts the conclusion (albeit by dictum) that mass torts, such as airplane crashes, are amenable to class action treatment, but denies it to the mass selling of an identical product, allegedly defective, which was accompanied by identical sales literature. But, it is in the latter case, not the former, that class action treatment is most needed. In the latter case, proving the product's defect and the misleading nature of the accompanying literature would require sophisticated proof which might well be beyond the financial means of any individual plaintiff. In the former case the liability issue is of minimum difficulty, and the damages are normally of a maximal amount. As Governor Carey indi-

cated in his approving memorandum it was to fill the need in just this type of situation that article 9 was enacted—i.e., to encourage litigation where a wrong has been done but where the cost of prosecuting the litigation in any one case might possibly exceed any possible recovery.

There is nothing in the history of article 9, and certainly nothing in its content, that would segregate products liability cases from other types of negligence actions in the consideration of class action certification. It cannot be denied that if defendant were to concede that the shield was defective and that its literature did not sufficiently warn of the dangers, that the cost of litigation that would be borne by each injured user of the shield would then be enormously decreased, even though the issues of proximate cause, reliance, Statute of Limitations and contributory negligence might yet remain for determination. It is indeed ironic to deny such relief in its hour of greatest need and even more ironic to do so, in part, as the majority does, on contentions made by attorneys specializing in the negligence field, no matter how pre-eminent they may be.[5] It is a truism that relying on a fox to protect one's chickens is not a prudent practice. Professor Siegel, in his comment in New York Practice anticipating the views of negligence practitioners, forcefully answered them when he said (New York Practice, p 182): "It is traditional in personal injury actions for each plaintiff to retain his own lawyer, choose his own venue (the one reputed to offer the highest verdicts), and make his own settlement. Attorneys with practices in which tort litigation predominates will be likely to stress those factors and urge that the class action not be allowed to divest them of their traditional prerogtaives. But these arguments, without reflecting one way or another on their legitimacy, are more relevant to the damages aspects of these cases than to the liability phase, and it is mainly as to liability that class form would be germane. An appropriate venue could be chosen for the class-form liability trial, with each individual then left, if liability is established, to bring a separate action in his own preferred venue to adjudicate the individual damages—if, indeed, a liability finding has not brought about a settlement and obviated further litigation."

For the reasons aforestated, I believe that this court's affirmance of the order of Special Term fails to give this

---

5. The fact that the two attorneys cited by the majority represent 14 plaintiffs, in itself speaks volumes for the use of a class action.

ameliorative statute (CPLR 906) the breathing space it needs to survive and is, in effect, strangulation by interpretation.[6]

TITONE, J. P., and COHALAN, J., concur with GULOTTA, J.; SHAPIRO, J., dissents and votes to reverse the order and grant plaintiff's motion to the extent of granting class action certification to the issues of defective design and failure to warn, with an opinion.

Order of the Supreme Court, Nassau County, dated November 30, 1977, affirmed, with $50 costs and disbursements.

---

**6.** The majority says that "[a]ssuming, for the sake of argument, that in the instant litigation it were to be proved that the Dalkon Shield *had been* defectively designed, it could *not* be inferred therefrom that each and every woman who suffered pelvic or uterine injury following the use of the Dalkon Shield suffered that injury *as a result* of her use of said shield. The injuries *may* have resulted from a variety of factors completely unrelated to the use of the Dalkon Shield" (emphasis in original). That contention is in line with the entire thrust of the majority opinion, which reaches out to find reasons why CPLR 906 cannot be used, instead of why it can, and overlooks the fact that the same contention made by it could be made in the case of any mass tort or mass disaster—even in the case of an airplane crash, which the majority apparently concedes would be a proper vehicle for a class action, for any particular passenger might have died of heart failure before anyone was aware that the plane was going to crash.