307 S.E.2d 647

**Mrs. Thomas BURKS, et al.**

v.

**Bill O. WYMER, etc., et al.**

**No. 15336.**

Supreme Court of Appeals of West Virginia.

July 8, 1983.

Rehearing Denied Oct. 20, 1983.

whether mass tort class actions can be maintained under *W. Va. R. Civ. P.* 23. Federal and state courts have recognized that certain tort actions may be properly maintained as class actions, and have developed factors for trial judges to consider in evaluating such proposed actions. We agree that certain tort actions may be maintained as class actions. Our task in this opinion is to establish standards for West Virginia courts to use in deciding whether to allow a particular tort class action.

Initially, we note that inordinate delay has characterized this litigation at every stage and we are concerned with the additional delay which will be occasioned by remand. However, this case poses complex issues in a difficult and developing area of law. The record herein is insufficient to allow a determination of the validity of appellant's proposed class action, and we remand for proceedings consistent with the principles enunciated in this opinion.

This opinion is divided into five parts. In Part I the facts of the case are summarized. Part II considers the provisions of the 1938 and 1966 versions of *Federal Rule of Civil Procedure* 23 which authorize "spurious" class actions. In Part III we survey some of the case law which has dealt with mass tort class actions. We then proceed in Part IV to establish factors for West Virginia courts to consider in deciding whether to allow spurious class actions. Finally, Part V considers the propriety and utility of discovery and pre-trial hearings in the class action context.

Douglas Miller, Charleston, for appellants.

Michael Bonasso, Kay, Casto & Chaney, Charleston, for appellees.

McHUGH, Justice:

Appellant, Mrs. Thomas Burks, appeals from a March 7, 1979 order of the Circuit Court of Kanawha County denying appellant's motion to proceed by class action.[1] This appeal presents the novel issue of

I

Appellant owned and occupied property located on Wertz Avenue in Charleston. Appellees Bill O. Wymer and Eastland Company owned real estate on Hillcrest Drive above and adjacent to appellant's property. Appellees allegedly altered the topography of the Hillcrest Drive property in such a way as to cause rock slides and flooding affecting real and personal property situated on Wertz and McKee Avenues. Such alteration of the topography is al-

---

1. Former appellant William Berkeley, Jr., pro-　ceeded in an individual action discussed *infra*.

leged to have been either intentional or negligent. At most, 123 homes are alleged to have been affected by flooding or rock slides resulting from appellees' tortious acts.

Appellant sought to represent a class composed of "all persons owning real estate or residing on Wertz or McKee Avenues in the city of Charleston." She cited *W.Va.Rule* 23(a)(2) and 23(a)(3) as authorizing the action and sought an injunction prohibiting further alterations in the Hillcrest property as well as actual and punitive damages. The trial court considered briefs by the parties on the issue of the propriety of the class action and issued a memorandum opinion denying appellant's motion to proceed by class action.

After denial of this motion, William Berkley, Jr., a former proposed class representative, proceeded to trial with a co-plaintiff, William Houston Berkley. William Berkley, Jr. obtained a judgment for $3,100 against appellee Bill O. Wymer. The jury returned a verdict in Wymer's favor in co-plaintiff William Houston Berkley's case.

Pursuant to the rule enunciated in Syllabus point 6 of *Mitchem v. Melton*, 167 W.Va. 21, 277 S.E.2d 895 (1981), appellant appealed the circuit court's adverse ruling on her proposed class action to this Court.[2] Appellant requests this court to direct the trial court to allow her proposed class action.

## II

State class action rules are less diverse than might be expected because a large majority of states have substantially adopted the 1966 version of Federal Rule of Civil Procedure 23. West Virginia is one of the few states retaining the 1938 model of Federal Rule 23.[3] An understanding of the provisions of both models of the rule applicable to mass tort class actions is important.

*W.Va.R.Civ.P.* 23 is identical in its relevant provisions to the 1938 version of *Fed. R.Civ.P.* 23, which reads, in pertinent part:

"(a) *Representation.* If persons constituting a class are so numerous as to make it impracticable to bring them all before the court, such of them, one or more, as will fairly insure the adequate representation of all may, on behalf of all, sue or be sued, when the character of the right sought to be enforced for or against the class is ... (3) several, and there is a common question of law or fact affecting the several rights and a common relief is sought."

This provision authorizes "spurious" class actions, defined by Moore's Federal Practice as a class action where the character of the right is several and a common question of law or fact is presented and a common relief is sought. J. Moore and J. Kennedy, Moore's Federal Practice § 23.04[1] (2d ed. 1982). Mass tort class actions must fall into this category of class actions, as the claims of plaintiffs in a tort action are, by their nature, several as opposed to joint, common or secondary.

The 1966 model of Federal Rule 23 drastically altered the provisions for maintaining a spurious class action, introducing ex-

---

**2.** Appellees contend that this appeal is time barred because, instead of filing an appeal immediately upon denial of permission to maintain their class action, appellants proceeded to trial on the merits in the two Berkeley cases discussed above, and then appealed the class action issue to this court. Because more than nine months had passed from the trial court's order denying permission to proceed by class action, appellants argue that any appeal of this issue is barred, citing *Mitchem v. Melton*, 167 W.Va. 21, 277 S.E.2d 895 (1981). While *Mitchem* allowed an appeal from an order denying class action status, it did not require such an appeal. Nothing in *Mitchem* or its progeny indicates that the class action issue may not be timely appealed after a resolution of the trial on the merits in individual actions. *See, e.g., McFoy v. Amerigas, Inc.,* 170 W.Va. 526, 295 S.E.2d 16 (1982). Indeed, a contrary result would practically guarantee an unnecessary multiplicity of appeals in any case where plaintiffs sought both to appeal denial of class action status and also to appeal rulings made in the trial on the merits.

**3.** As of January 1, 1982, 32 states and the Commonwealth of Puerto Rico had adopted class action rules based upon the 1966 version of the Federal Rule. West Virginia was among six states continuing to use some variant of the 1938 Federal Rule. H. Newberg, *Newberg on Class Actions,* § 1210b (Supp.1983).

plicit tests for the court to apply in deciding whether a proposed spurious class action should be allowed:

" '(a) *Prerequisites to class action.* One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties will fairly and adequately protect the interests of the class.

" '(b) *Class Actions Maintainable.* An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition...

" '(3) the court finds that the questions of law or fact common to the members of the class *predominate* over any questions affecting only individual members, and that a class action is *superior* to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.' " *Fed.R.Civ.P.* 23 (in part) (emphasis added).

The Rule 23(b)(3) findings most often central in class certification in mass tort cases are those of predominance and superiority. Professor Arthur R. Miller has noted that "there can be predominance without the common issues being determinative ... [i]ndeed, there are some contexts where predominance will exist with only a single issue being common; that issue is simply so overwhelming in its centrality to the litigation that it, in and of itself, satisfies predominance." A. Miller, *An Overview of Federal Class Actions: Past, Present, and Future,* 48–49 (1977). The superiority requirement calls upon the court to compare the class action vehicle with alternative adjudicative options, such as consolidation. The 1938 version of the rule contained no predominance or superiority requirements.

## III

State and federal courts have concurred in judging certain factual settings inappropriate for class action treatment. Proposed classes composed of persons alleged to have been injured by improper medical treatment have generally been rejected by the courts. In several cases plaintiffs have attempted to establish classes comprised of individuals who suffered personal injuries as a result of an allegedly defective intrauterine device known as the Dalkon Shield. In a recent opinion the Ninth Circuit Court of Appeals noted that frequently in medical tort cases:

"No single happening or accident occurs to cause similar types of physical harm or property damage. No one set of operative facts establishes liability. No single proximate cause applies equally to each potential class member and each defendant." *In Re Northern Dist. of Cal., Dalkon Shield Etc.,* 693 F.2d 847, 853 (1983).

Thus, the Ninth Circuit held that predominance of common over individual issues was not satisfied. *Rosenfeld v. A.H. Robins,* 63 A.D.2d 11, 407 N.Y.S.2d 196 (1978), presented a proposed Dalkon Shield class action in a state court setting. The New York court discussed the developing area of mass tort class actions, noting that leading commentators have suggested that this form of action is particularly appropriate in certain limited situations:

"The thrust of all these authors is substantially the same, namely, that in a mass tort or mass accident situation, such as a major airplane crash or train wreck, the courts should seriously consider isolating the issue of liability for class action treatment, while allowing the individual determinations on damages to be tried separately thereafter ... There are, however, important differences between mass torts of the type referred to above and product liability cases such as

the case at bar, particularly insofar as the question of causality is concerned. Thus, in the typical mass tort situation, proximate cause can usually be determined on a class-wide basis, since the 'cause' of the common disaster will always be identical as to each of the plaintiffs, while contributory negligence on the part of an individual plaintiff is virtually nonexistent." 63 A.D.2d at 15, 407 N.Y.S.2d at 198 (citation omitted).[4]

In the Dalkon Shield cases the New York court noted that key factual issues of causation as well as issues of reliance upon warranties would have to be determined on an individual basis. Some of the factual issues might have been amenable to class treatment but these did not predominate, in the court's view. The proposed class action was rejected.

Other medical tort class actions have met fates similar to the Dalkon Shield cases. In *Harrigan v. United States*, 63 F.R.D. 402 (E.D.Pa.1974) the district court noted that where the central issue in a case is "whether, considering all the circumstances, each patient gave his informed consent to the operation" a class action was inappropriate, as common issues would not predominate the litigation. *See also, Rose v. Medtronics, Inc.*, 107 Cal.App.3d 150, 166 Cal.Rptr. 16 (1980) (denying class action regarding allegedly defective pacemakers) and *Morrissy v. Eli Lilly & Co.*, 76 Ill.App.3d 753, 32 Ill.Dec. 30, 394 N.W.2d 1369 (1979) (denying class action on behalf of daughters allegedly harmed by their mothers' ingestion of the drug diethylstilbestrol).

In contrast to the medical tort area, federal and state courts have agreed in two cases involving alleged food poisoning of a large group of persons that class action treatment was appropriate. *Bentkowski v. Marfuerza Compania Maritima, S.A.*, 70 F.R.D. 401 (E.D.Pa.1976), considered a proposed class "comprised of all those passengers aboard the 'Ellinis' [a ship] during a voyage commencing July 14, 1973, who suffered injuries or illness as a result of con-

taminated provisions sold or provided to the passengers." 70 F.R.D. at 402. The plaintiffs sought to proceed under *Fed.R. Civ.P.* 23(b)(3). The standards for determining the propriety of the class were found in 23(b)(3)(A, B, C and D) *supra*. One factor weighing heavily in the court's decision to certify the class was the relatively small dollar value involved in each of the 200 potential individual claims. The one case concluded before the class action was instituted resulted in a total settlement of $130 for two plaintiffs. The paucity of individual litigation (only two individual cases had been filed) also indicated the propriety of a class action. The *Bentkowski* court held that the proposed class of plaintiffs was appropriate, and certified the same.

In a case with a similar factual setting, the Supreme Court of Louisiana held that a class action remedy was available to a class comprised of 600 prisoners in the state penitentiary who alleged that they had suffered painful but temporary attacks of food poisoning after eating a contaminated meal served at the prison. *Williams v. State*, 350 So.2d 131 (La.1977). The Louisiana class action rule was somewhat similar to the 1938 federal rule. The *Williams* court went beyond the skeletal authorization of the rule and set forth detailed factors by which the proposed class action was to be judged. These factors closely track the requirements of the 1966 version of *Fed.R. Civ.P.* 23. The Louisiana court found that common questions predominated over individual ones and then proceeded to the issue of whether a class action was a superior method of litigating the plaintiffs' claims. The *Williams* court addressed the four factors found in *Fed.R.Civ.P.* 23(b)(3)(A, B, C, and D), and found that all either weighed in favor of the class action or were neutral. Of particular importance was the fact that the small damages likely to be recovered by each plaintiff militated against individual litigation, and the fact

---

**4.** Of course contributory negligence, in its traditional sense, is no longer the law of West Virginia. *See, Bradley v. Appalachian Power Co.*, 163 W.Va. 332, 256 S.E.2d 879 (1979).

that few of the potential plaintiffs had filed individual lawsuits.[5]

Other factual settings have produced mixed results. For instance, two cases have considered proposed class actions seeking damages for injuries allegedly resulting from chemical toxins escaping from disposal sites near the plaintiffs' homes. In *Snyder v. Hooker Chemicals & Plastics*, 104 Misc.2d 735, 429 N.Y.S.2d 153 (1980), a case arising from the much-publicized Love Canal incident, the class was not certified, whereas in *Millet v. Rollins Environ. Services of La.*, 428 So.2d 1075 (La. App.1983), the class was certified. The cases are primarily distinguishable on two grounds. In *Snyder* five hundred fifty-six individual lawsuits had begun as of the date of the class action was filed, and 84.5% of those suits were handled by two law firms. Thus, substantial individual litigation was underway. In *Millet*, the Louisiana court noted that the vast majority of potential plaintiffs had not filed individual lawsuits and had demonstrated no interest in controlling their own lawsuit. Second, the damages sought by plaintiffs in the class proposed in *Snyder* were large, certainly large enough to justify the expense of individual lawsuits, whereas the damages sought by individual plaintiffs in *Millet* were relatively small.

A review of the class action cases, including those discussed above, convinces us that the factors found in sub-part (b)(3) of the 1966 version of *Fed.R.Civ.P.* 23 have proved consistently useful in determining which proposed spurious class actions should be allowed, and which should not. Indeed, Louisiana has adopted these factors, though their rule, like ours, is based upon the 1938 model of Rule 23. *See Williams v. State, supra.* However, we need not adopt the federal rule's strict structure which absolutely requires findings of predominance and superiority before a class action may be allowed. West Virginia courts do not face the flood of class actions which the federal courts seek to limit by rigid requirements. Accordingly, we adopt a more flexible approach.

IV

■ Numerosity and commonality are, of course, absolute prerequisites to maintaining any class action. Nothing in this opinion should be construed as disturbing these established threshold requirements. *See, e.g., Mitchem v. Melton*, 167 W.Va. 21, 277 S.E.2d 895, 902 (1981); J. Moore and J. Kennedy, Moore's Federal Practice § 23.05–.06–2 (2d ed. 1982). Assuming these two requirements have been met, the following factors should be considered in deciding whether to allow a "spurious" class action under *W.Va.R.Civ.P.* 23(a)(3):

(1) whether common questions of law or fact predominate over any questions affecting only individual members;

(2) whether other means of adjudicating the claims and defenses are practicable or inefficient;

(3) whether a class action offers the most appropriate means of adjudicating the claims and defenses;

(4) whether members not representative parties have a substantial interest in individually controlling the prosecution or defense of separate actions;

(5) whether the class action involves a claim that is or has been the subject of a class action, a government action, or other proceeding;

(6) whether it is desirable to bring the class action in another forum;

(7) whether management of the class action poses unusual difficulties;

(8) whether any conflict of laws issues involved pose unusual difficulties; and

(9) whether the claims of individual class members are insufficient in the amounts or interests involved, in view of the complexities of the issues and the expenses of the litigation, to afford significant relief to the members of the class.

These factors are derived from § 3(a) of the Uniform Class Action Rule promulgated in 1977 by the National Conference of Commissioners of Uniform State Laws. 12 Uniform Laws Annotated 23 (Supp.

---

**5.** Only 10 of 600 potential plaintiffs had filed separate suits. *Williams, supra,* at 137.

1983).[6] None of these factors is an absolute prerequisite to the maintenance of a class action. They should be considered together in deciding whether to allow a class action.

As the factors set forth above are employed by litigants and courts, their precise operation will become more established. We cannot seek to anticipate all the situations which may require interpretation of these factors. By way of illustration, however, we believe it beneficial to address each of the factors set forth above individually, giving a short example of the operation of each.

> (1) Whether common questions of law or fact predominate over any questions affecting only individual members.

This factor is analogous to the test set forth in F.R.Civ.P. 23(b)(3) for predominance. Examples of clear predominance of common over individual questions are found in cases where a class action is brought to challenge a condition of confinement affecting all members of a jail population. *See, e.g., Mitchem v. Melton, supra; State ex rel. Miller v. Sencindiver,* 170 W.Va. 288, 294 S.E.2d 90 (1982).

> (2) Whether other means of adjudicating the claims and defenses are practicable or inefficient.

Certain defenses may, as a practical matter, call for substantial proof relating to each and every individual who is a member of the proposed class. For instance, where the adequacy of informed consent in medical cases is a central issue in a proposed class action, the inefficiency of adjudicating hundreds of these claims in a single action has been held to be a substantial impediment to proceeding by class action. *Harrigan v. United States,* 63 F.R.D. 402 (E.D. Pa.1974).

> (3) Whether a class action offers the most appropriate means of adjudicating the claims and defenses.

This factor is analogous to the requirement in F.R.Civ.P. 23(b)(3) that a class action be superior to other methods for adjudicating the claims and defenses raised. It involves a consideration of the degree to which the particular class action proposed meets the other factors set forth herein.

> (4) Whether members not representative parties have a substantial interest in individually controlling the prosecution or defense of separate actions.

As a general rule, where severe personal injuries have resulted from an action, interest in individually controlling the prosecution of separate actions will be high, whereas if only minor economic injuries were sustained, interest in individually controlling the prosecution of separate actions will be low. *Compare Causey v. Pan American World Airways, Inc.,* 66 F.R.D. 392, 399 (E.D.Va.1975) (class action seeking damages for deaths resulting from plane crash) *with Miller v. Rollins Environ. Services of Louisiana,* 428 So.2d 1075 (La. App.1983) (class action seeking damages for offensive odors).

> (5) Whether the class action involves a claim that is or has been the subject of a class action, a government action, or other proceeding.

An example of a government proceeding which could be considered in deciding whether to allow a class action is an action filed with the West Virginia Human Rights Commission under *W.Va.Code* § 5–11–10 [1971] by the party or parties seeking to proceed by class action. Naturally, dual adjudication of the same issues is not desirable.

> (6) Whether it is desirable to bring the class action in another forum.

---

**6.** There are provisions of the Uniform Class Action Rule which we have not set forth. Some of these relate to class certification. Because West Virginia does not require class certification as a prerequisite to class actions, see *Mitchem v. Melton, supra,* the provisions of the Uniform Rule relating to certification are inapplicable. Others relate to "true" and "hybrid" class actions authorized by *W.Va.R.Civ.P.* 23(a)(1) and (2), see *Mitchem v. Melton, supra,* at 902 (*quoting,* M. Lugar and L. Silverstein, *West Virginia Rules of Civil Procedure* 196 (1960)) and to the management, conduct, and effect of class actions. These matters are beyond the scope of this appeal and need not be considered by this court. *See, generally, Grigg v. Michigan National Bank,* 405 Mich. 148, 274 N.W.2d 752 (1979) (Coleman, C.J., addendum).

For instance, the fact that the parties to a proposed class action are almost all located in California and the witnesses are in California may be considered by a West Virginia court asked to allow the class action to proceed in West Virginia. *See, e.g., Causey, supra.*

(7) Whether management of the class action poses unusual difficulties.

The difficulty of administering the relief sought by a class action may pose unusual difficulties for a court. The difficulty of administering relief should not alone be cause for denial of the class action but may properly be considered with the other factors. *See*, Gordon, "Manageability Under the Proposed Uniform Class Actions Act," 31 S.W.L.J. 719, 738 (1977).

(8) Whether any conflict of laws issues involved pose unusual difficulties.

This factor is basically self-explanatory. Situations in which significant conflict of laws problems pose unusual difficulties may be inappropriate for class action treatment. *See, e.g., Causey, supra.*

(9) Whether the claims of individual class members are insufficient in the amounts or interest involved, in view of the complexities of the issues and the expenses of the litigation, to afford significant relief to the members of the class.

The strongest case for class action treatment under this factor would be where the claims of individual litigants are relatively small but the complexity of the issues involved is great. *See, Oakwood Homeowners v. Ford Motor*, 77 Mich.App. 197, 258 N.W.2d 475 (1977).

Naturally, several of the factors set forth above are interrelated. For instance, when predominance of common over individual questions is present, a class action is more likely to be a practicable and efficient means of adjudicating the claims and defenses of the parties. No one factor is determinative of the propriety of a particular proposed spurious class action. They must all be considered and weighed by the trial judge in deciding whether to allow the proposed action.

V

In his monograph, *An Overview of Federal Class Actions: Past, Present, and Future* (1977), Professor Arthur Miller argues persuasively that discovery and pre-trial hearings should be employed by trial courts to determine whether a proposed class action is proper:

"In all too many instances the papers on the certification motion are extensive in size but thin in content. The movant typically alleges compliance with each of the class action prerequisites in highly conclusory terms and devotes most of his attention to demonstrating that he is a paragon of the bar and a worthy class representative. In most cases the judge will learn precious little from a document like that and probably even less from the defendant's equally conclusory arguments that the class action prerequisites have not been satisfied.

\*   \*   \*   \*   \*   \*

Thus, I am sympathetic toward the growing practice of insisting on some discovery relating to the propriety of class action treatment, particularly with regard to such issues as adequacy of representation, predominance of the common questions, and the superiority of the class action procedure. The certification issue is too important to permit the lawyers to furnish boiler plate memoranda laden with self-serving conclusions." A. Miller, *An Overview of Federal Class Actions: Past, Present, and Future*, 14–15 (1977).

We agree that, in most cases, an exploration beyond the pleadings is essential to make an informed judgment on the propriety of a proposed spurious class action. *See also*, Rutherglen, "Title VII Class Actions", 47 U.Chi.L.R. 688, 725 (1980). Certainly the pleadings in the instant case are couched in the "highly conclusory terms" which concerned Professor Miller. However, pre-trial hearings are to be carefully limited.

The United States Supreme Court has stated:

"[N]othing in either the language or history of Rule 23 ... gives a court any authority to conduct a preliminary inquiry *into the merits* of a suit in order to determine whether it may be maintained as a class action." *Eisen v. Carlisle and Jacquelin,* 417 U.S. 156, 177, 94 S.Ct. 2140, 2152, 40 L.Ed.2d 732, 748 (1974) (emphasis added)

We quite agree that the trial court's guess as to which party would prevail at trial should have no bearing on the allowance or disallowance of a proposed class action. As Professor Miller noted in his monograph, the Supreme Court's ruling in *Eisen* is not inconsistent with a full pretrial exploration of the case to ensure that it is an appropriate class action.

Accordingly, we remand with directions that discovery be employed and a hearing held to determine whether the appellant's proposed class action should be allowed in light of the factors set forth herein.

Reversed and remanded with directions.