474 S.E.2d 186

**STATE of West Virginia ex rel. METROPOLITAN LIFE INSURANCE COMPANY, Petitioner,**

v.

**Honorable Larry V. STARCHER, Judge of the Circuit Court of Monongalia County, and, Lawrence Holt, et al., Respondents.**

**No. 23382.**

Supreme Court of Appeals of
West Virginia.

Submitted May 28, 1996.

Decided July 12, 1996.

Timothy J. Padden, Rose, Padden & Pettry, Morgantown, Edgar A. Poe, Jr., Shuman, Annand & Poe, Charleston, Lorna G. Schofield, Debevoise & Plimpton, New York City, New York, Patrice Smiley Andrews, Michelle J. d'Arcambal, Metropolitan Life Insurance Company, New York City, New York, Frederick N. Egler, Jr., Egler, Garrett & Egler, Pittsburgh, Pennsylvania, for Petitioner.

Michael P. Malakoff, James M. Pietz, Malakoff, Doyle & Finberg, Pittsburgh, Pennsylvania, J. Michael Benninger, Wilson, Frame, Benninger & Metheny, Morgantown, for Respondent Class Plaintiffs.

WORKMAN, Justice:

Petitioner Metropolitan Life Insurance Company ("MetLife") seeks a writ of prohibition directing the Circuit Court of Monongalia County to withdraw its order certifying a plaintiff class in an action instituted by MetLife policyholders to recover for alleged improprieties in connection with the issuance of additional life insurance policies. We grant the requested writ of prohibition as moulded based on our conclusion that the class and the mechanics of assembling potential class members' names, as framed in the certification order, have not been identified with sufficient clarity.

In the underlying civil action, Plaintiffs aver that MetLife engaged in a form of "churning" or "twisting"[1] by improperly utilizing accumulated cash values, dividends, and interest in existing life insurance policies to finance the purchase of additional policies.[2] In addition to breaching the respective contracts of insurance, these Plaintiffs allege that MetLife's actions violate various statutory and regulatory provisions.[3] By order dat-

---

1. Within the insurance industry, this is also referred to as "piggybacking."

2. The alleged scheme involved the failure to distribute disclosure warnings mandated by state law that advise policyholders of the risks associated with funding an additional insurance policy by using the accumulated value of an existing policy. This is referred to as a "replacement" transaction. Through this alleged scheme, MetLife agents could collect larger commissions because the typical commission on a "new" policy would be 55% of the first year's premium and 10% thereafter, whereas the commission realized on a "replacement" policy is purportedly much less. The scheme worked as follows: (1) existing MetLife policyholders would complete an application for additional insurance indicating on such application that existing insurance was not to be replaced; (2) the MetLife agent would similarly indicate on the application that existing insurance was *not* being replaced; (3) no disclo-

sures were provided to the policyholders; and (4) contrary to the application, a transfer of policy values between existing and additional policies took place. Plaintiffs aver that the commission realized by the agent is determined from the information stated on the application.

3. Under West Virginia law, insurers must comply with specified disclosure requirements when issuing replacement insurance, that is, insurance funded by existing equity in a previously existing policy. *See* 114 W. Va.C.S.R. §§ 8–4, 8–5. The insurance agent is required to provide the insured with "a copy of the 'Notice Regarding Replacement of Life Insurance' signed by the applicant, a copy of the Comparative Information Form signed by the agent and the applicant, and a copy of all sales proposals used for presentation to the applicant." *Id.* § 8–5.1(c)(1). Failure to abide with these disclosure provisions can subject the insurer to "such penalties as may be

ed February 15, 1996, the circuit court granted class certification, defining the class as

> all West Virginia residents who were owners of existing life insurance or annuity policies with Metropolitan Life Insurance Company from 1983 to the present and were sold subsequent policies that were classified and/or charged as new policies when in fact they were replacement policies and should have been classified and/or charged as such.

The court directed that proposed class notices be submitted within forty days and further ordered MetLife to provide Plaintiffs with the names and addresses of all potential class members within sixty days.

Through this writ of prohibition, filed on March 12, 1996, MetLife seeks to prohibit the class action from proceeding pursuant to the lower court's directives. MetLife argues that the circuit court erred in certifying a class action on the grounds that: (1) the members of the class are not objectively identifiable; (2) the class is not identifiable without litigating the merits of each individual claim; (3) common questions of fact and law are few compared with the individualized issues to be decided; (4) the class would not be manageable; and (5) judicial economy would not be served.

In *Burks v. Wymer,* 172 W.Va. 478, 307 S.E.2d 647 (1983), we held that:

> The following factors should be considered by a trial judge in deciding whether a "spurious" [4] class action may be maintained under *W.Va.R.Civ.P.* 23(a)(3): [5]

(1) whether common questions of law or fact predominate over any questions affecting only individual members;

(2) whether other means of adjudicating the claims and defenses are practicable or inefficient;

(3) whether a class action offers the most appropriate means of adjudicating the claims and defenses;

(4) whether members not representative parties have a substantial interest in individually controlling the prosecution or defense of separate actions;

(5) whether the class action involves a claim that is or has been the subject of a class action, a government action, or other proceeding;

(6) whether it is desirable to bring the class action in another forum;

(7) whether management of the class action poses unusual difficulties;

(8) whether any conflict of laws issues involved pose unusual difficulties; and

(9) whether the claims of individual class members are insufficient in the amounts or interests involved, in view of the complexities of the issues and the expenses of the litigation, to afford significant relief to the members of the class.

*Id.* at 479, 307 S.E.2d at 647–48, Syllabus (footnotes added). Applying these factors, the circuit court determined that all of the *Burks* factors were present including a "predominance of common questions of law and

---

appropriate under the insurance laws of West Virginia." *Id.* § 8–8.1(a).

Through the amended class complaint, plaintiffs also seek relief for violation of the West Virginia Consumer Credit and Protection Act, W. Va.Code § 46A–6–102(f)(5), (7), and (12) (1995); violation of West Virginia Code § 33–11–4 (1996) for committing unfair or deceptive acts in connection with the sale of insurance; violation of New York insurance laws making it illegal for any New York insurance company to misrepresent the terms of its policies; breach of fiduciary duty and breach of the duty of good faith and fair dealing; and damages for negligent supervision, deceit by concealment, and common law non-disclosure.

4. A "spurious" class, as explained in *Burks,* is "a class action where the character of the right is

several and a common question of law or fact is presented and a common relief is sought." 172 W.Va. at 480, 307 S.E.2d at 649 (citing J. Moore and J. Kennedy, *Moore's Federal Practice* § 23.04[1] (2nd ed. 1982)).

5. Rule 23(a)(3) provides:

> *Representation.*—If persons constituting a class are so numerous as to make it impracticable to bring them all before the court, such of them, one or more, as will fairly insure the adequate representation of all may, on behalf of all, sue or be sued, when the character of the right sought to be enforced for or against the class is ... (3) several, and there is a common question of law or fact affecting the several rights and a common relief is sought[.] W.Va.R.Civ.P. 23(a)(3).

fact"[6] arising from MetLife's conduct "at or after the time of the actual contracting for the life insurance which is in question."[7]

 We find it unnecessary to approach this case from the traditional factor-by-factor approach typical to class action cases because MetLife's contentions concerning identification of potential class members appear to be the actual crux of its disputation. Accordingly, we concentrate our focus on the identification issue. MetLife disagrees with the lower court's conclusion that all potential class members can be readily identified from MetLife's form documents. The circuit court found that

> [t]he breach of contract claim and other asserted West Virginia common law claims are not based upon oral testimony but are instead based upon proof of the standard form documents utilized by the defendant [MetLife] in its processing of insurance applications and the issuance of life insurance policies and the standardized rules, procedures and conduct of the defendant in handling these matters.

Contrary to this finding, however, MetLife maintains that individual inquiry is necessary to ascertain the respective intentions of each prospective class member concerning the funding of the additional policy of insurance that they purchased.

 It is axiomatic that a class suit may not be maintained if the purported class is " 'too ill-defined.' " *Moore v. Western Pennsylvania Water Co.*, 73 F.R.D. 450, 453 (W.D.Pa.1977) (quoting *Giordano v. Radio Corp. of America*, 183 F.2d 558, 561 (3rd Cir.1950)); *see DeBremaecker v. Short*, 433 F.2d 733, 734 (5th Cir.1970) (holding that class must be "adequately defined and clearly ascertainable"); *Considine v. Park Nat'l Bank*, 64 F.R.D. 646, 647 (E.D.Tenn.1974) (denying certification because plaintiff "fail[ed] to describe the class with the necessary specificity"); 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1760 at 123–24 (1986) (noting that "the class definition cannot be too amorphous"). Similarly, MetLife insists that the class must be defined "in objective terms that are capable of present ascertainment." *Manual for Complex Litigation 2d* § 30.14 at 213 (Fed. Judicial Ctr. 1985).

We look to the instant case to determine whether the class, as defined by Plaintiffs, has been, or is capable of being, identified, and, if so, whether MetLife has the ability to produce this information. MetLife's purport-

---

6. The circuit court identified the following as questions in common to the potential class members:

—Did MetLife and its agents provide existing MetLife policyholders replacement policies that were contracted for and/or charged as new policies?

—Did MetLife place its policyholders at increased economic risk by providing them replacement policies that were contracted for and/or charged as new policies without complying with state insurance law?

—Did MetLife charge class members higher commissions and extra charges for replacement policies improperly contracted for as new policies?

—Did MetLife and its agents breach their policy contracts and/or fiduciary duties with plaintiffs and the class by failing to correctly disclose the nature, terms and conditions of their contracts in policy applications? And

—Did MetLife in the sale of replacement policies improperly contract for and/or charge them as new policies, and actively conceal material information (including information required to be provided by the state) from class members relating to the nature and costs of the transactions?

7. Thus, the circuit court distinguished the instant case from *Cope v. Metropolitan Life Insurance Co.*, No. 94–Civ–428 (Common Pleas, Columbiana Co., Ohio July 6, 1995), by identifying the relevant MetLife conduct as that which occurred "at or post-contracting." In *Cope*, a decision cited and relied upon by MetLife, the court ruled that certification of a class pursuant to a virtually identical class definition to that certified here was improper based on the existence of fiduciary duty claims that required a case-by-case demonstration of the existence of special confidence and trust under Ohio law. Slip op. at 10–11 (*citing Shaver v. Standard Oil Co.*, 89 Ohio App.3d 52, 623 N.E.2d 602, 609 (1993)). Based on *Shaver*, the court in *Cope* determined that "[t]he individualized proof necessary to litigate this case overrides the common questions of law and fact making it necessary to deny class certification." Slip op at 11. In the underlying case, the circuit court found significance in the fact that the instant Plaintiffs, unlike the plaintiffs in *Cope*, were not alleging "oral misrepresentations or any other actionable conduct *prior* to the time of contracting for life insurance." (emphasis supplied)

ed inability to identify those individuals properly falling within the plaintiff class stems from the parties' differing views of the term "replacement," as that term is defined by state regulation. "Replacement" is defined as

> any transaction in which new life insurance is to be purchased, and it is known or should be known to the proposing agent, or to the proposing insurer if there is no agent, that by reason of such transaction, existing life insurance has been or is to be:
>
> (a) Lapsed, forfeited, surrendered, or otherwise terminated; or
>
> (b) Converted to reduced paid-up insurance, continued as extended term insurance, or otherwise reduced in value by the use of nonforfeiture benefits or other policy values; or
>
> (c) Amended so as to effect either a reduction in benefits or in the term for which coverage would otherwise remain in force or for which benefits would be paid; or
>
> (d) Reissued with any reduction in cash value; or
>
> (e) Pledged as collateral or subjected to borrowing, whether in a single loan or under a schedule of borrowing over a period of time for amounts in the aggregate exceeding twenty-five percent (25%) of the loan value set forth in the policy.

114 W. Va.C.S.R. § 8–2.1.

By focusing on the "known or should be known" language within the regulation, MetLife argues that a subjective determination of the mental state of either the insurance agent and/or the insured regarding the knowledge of the agent and the intentions of the insured is required.[8] Citing a need to conduct extensive individualized inquiries of all potential class members to determine their subjective mental states, MetLife maintains that a plaintiff class cannot be readily and economically identified. Importantly, however, the honing of the prospective plaintiff class that occurred during oral argument of this case appears to eliminate the subjective inquiry concerns raised by MetLife. In response to the questions of this Court during oral argument, Plaintiffs identified those individuals who should be included in the class as: (1) anyone who notified MetLife before the date of the purchase of an additional life insurance policy, through execution of a "service request form," that they intended to use accumulated value from an existing policy to fund the additional policy with funds rolled over from the existing policy; and (2) anyone who notified MetLife *after* the additional policy had been delivered to them that they desired to "replace" the additional policy with funds from a prior policy.[9] According to Plaintiffs, MetLife has at least two established computerized systems in place that would permit ready identification of these individuals. To identify those individuals that fall within the first category, Plaintiffs contended during oral argument that MetLife can refer to its CWS form, which delineates all those people who have executed a service request form. Plaintiffs further represented that those clients falling within the second category can be ascertained by referring to a document called a "Notification

---

**8.** Plaintiffs note that the "known or should be known" definition of "replacement" was expressly designed to provide an objective standard as explained in the legislative history:

> The earlier model used a standard of application to situations when an agent *knew* replacement was to take place; the amendments provided for the regulation's application if the agent *knew* or *should have known*. This enabled the commissioner to objectively apply a standard of practice that a licensed agent must follow. Consideration was given to changing the language to make the standard one where the agent *knew* or *had reason to believe* a replacement would result. That text was rejected as being too subjective, one which might

create the problem of proof of the agent's state of mind.

Model Regulation Service, NAIC Proceedings on Replacement of Life Insurance and Annuities, Section 2, "Definition of Replacement" at p. 613–12 (1994); *see also van der Heyde v. First Colony Life Ins. Co.*, 845 P.2d 275, 279 (Utah App.1993) (recognizing that relevant inquiry is whether agent "knew or should have known that he was selling a replacement policy" under Utah's regulatory parallel to 114 W.Va.C.S.R. § 8–2.1).

**9.** We presume that these individuals would still be within the time frame established by the lower court—from 1983 forward.

of Policy." This document is purportedly an amendment to the policy and would be filled out when an individual wants to accomplish replacement, but has already purchased the policy. Thus, by asking simply for the names of all individuals who have appeared on a CWS form as having executed a "service request form" seeking an outright replacement transaction and all those individuals who post-delivery executed a "notification of policy" thereby amending a policy to permit a replacement transaction, the class is defined independent of any determination of the policyholders' or the agents' intent.[10] *See* 114 W. Va.C.S.R. § 8–2.1.

Despite MetLife's protestations regarding its inability to know when its policyholders engage in a replacement transaction as defined by section 8–2.1 of the code of state regulations, Plaintiffs contend that MetLife's own documentation demonstrates the existence of such replacement transactions. *See* 114 W.Va.C.S.R. § 8–2.1. By law, MetLife is required to maintain a register of each replacement transaction pursuant to section 8–5(c)(7), which states that an insurer providing policies to West Virginia residents must:

> Maintain copies of the "Notice Regarding Replacement of Life Insurance," the verified Comparative Information Form, the Policy Summary, and all sales proposals used, and a replacement register, cross indexed, by replacing agent and existing insurer to be replaced, for at least three (3) years or until the conclusion of the next succeeding regular examination by the in-

surance department of its state or domicile, whichever is later.

114 W.V.C.S.R. § 8–5(c)(7).[11] In accordance with these requirements, Plaintiffs state that MetLife uses a "service request form" each time a withdrawal or transfer of policy values occurs and from these forms MetLife is apprised when cash values are being surrendered, withdrawn and/or transferred to another policy. Plaintiffs further aver that MetLife has an extensive computer system that tracks and records every replacement transaction that occurs.[12]

Upon examination, MetLife does not deny its ability to produce the names of those individuals who completed a service request form or for whom such a form was completed. Instead, MetLife focuses on the fact that policyholders have the unfettered right at any time to "replace existing life insurance after indicating in or as part of the applications for life insurance that such is not their intention." 114 W. Va.C.S.R. § 8–8.1(c).[13] While this right exists, it does not prohibit MetLife from being able to identify those individuals who act upon this right since a "notification of policy" document would be executed to effect the necessary amendment of the policy. Nor does the existence of this right stand as a bar to the commission of a regulatory violation. The drafters of the regulations expressly provided that when one agent exhibits a pattern of clients who first say "no" on the application regarding their intention to "replace" and then subsequently, change their mind, this constitutes "prima facie evidence of the agent's intent to violate

---

10. The parties are in agreement that "[a] class description is insufficient ... if membership is contingent on the prospective member's state of mind." *See Gomez v. Illinois State Bd. of Educ.,* 117 F.R.D. 394, 397 (N.D.Ill.1987).

11. Plaintiffs represent that MetLife failed to maintain this required register.

12. The record submitted in this case includes a description of MetLife's computer functions relative to its policyholder records. Two of these functions include the Financed By In Force Policies ("FIP") and the CWS system. According to the deposition testimony of MetLife Director of Individual Business Consulting Services, Edmund G. Rakowski, the FIP system tracks new issues of life insurance and financial transactions

between policies within the same household within a certain time frame, generally six months before and six months after a new policy is issued. The system also tracks loans, surrenders, and dividend withdrawals. The CWS system tracks cash surrenders, loans, withdrawals and deposits into traditional whole life policies.

13. That same regulatory provision continues by stating, "however, patterns of such action by policyholders who purchase the replacing policies from the same agent shall be deemed prima facie evidence of the agent's knowledge that replacement was intended in connection with the sales of those policies and such patterns of action shall be deemed prima facie evidence of the agent's intent to violate this regulation." 114 W. Va.C.S.R. § 8–8.1(c).

**526**

this regulation." [14] *Id.* § 8–8.1(c); *see supra* note 13.

An important aspect of Plaintiffs' case involves proving that MetLife did not comply with state regulations requiring it to tender various disclosure documents to policyholders in connection with the intended consummation of a replacement transaction. *See* 114 W. Va.C.S.R. §§ 8–4.1, 8–5.1. In response to MetLife's contention that individualized canvassing will be required to determine whether policyholders actually received the requisite disclosures, Plaintiffs respond that "MetLife's own form contracts contain objective written verifications by MetLife's agent[s] that the required disclosures were not made." Plaintiffs further state that MetLife does maintain a record of such disclosures when in fact they have been made. Since MetLife is required by law to maintain signed copies of the disclosures within each policyholder's file, Plaintiffs conclude that a breach of the disclosure requirement can be conclusively established by examination of the contract documents. *See* 114 W. Va. C.S.R. § 8–5.1(c)(7).

■ Inherent in MetLife's argument is the premise that no further inquiry should be necessary following distribution of the initial class notices for the purpose of identifying those individuals who may be properly included as plaintiffs in the class action. This simply is not the case. To demonstrate the existence of a class pursuant to Rule 23 of the West Virginia Rules of Civil Procedure, it is not required that each class member be identified, but only that the class can be objectively defined. *See Joseph v. General Motors Corp.,* 109 F.R.D. 635, 639 (D.Colo. 1986). Additionally, it is not a proper objection to certification that the class as defined

may include some members who do not have claims. *See id.* (discussing that "the fact that the class may initially include persons who have not had difficulties with their V8–6–4 engines or who do not wish to have these purported problems remedied is not important at this stage of the litigation") (citing 7 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1760 at 581*); Accord Elliott v. ITT Corp.,* 150 F.R.D. 569, 575 (N.D.Ill.1992). This is because "certification is conditional and may be altered, ex[p]anded, subdivided, or vacated as the case progresses toward resolution on the merits." *Joseph,* 109 F.R.D. at 638; *accord Catanzano ex rel. Catanzano v. Dowling,* 847 F.Supp. 1070, 1077 (W.D.N.Y.1994). What is required is that "the description of the class must be sufficiently definite so that it is administratively feasible for the court to ascertain whether a particular individual is a member." *Joseph,* 109 F.R.D. at 639; *see* 7A Wright, *supra* § 1760 at 120–21.

■ In concurrence with the rationale discussed in *Joseph,* we conclude that before certifying a class pursuant to Rule 23 of the West Virginia Rules of Civil Procedure, it is imperative that the class be identified with sufficient specificity so that it is administratively feasible for the court to ascertain whether a particular individual is a member. Since the nature of the information that would satisfy Plaintiffs appears to have been refined by the parties during oral argument [15] and because the record below does not indicate that the class definition was crafted with sufficient clarity, we grant the requested writ of prohibition.[16] We find no abuse of discretion regarding the circuit

14. Plaintiffs further note that two prerequisites exist to effecting the amendment from a non-replacement to a replacement transaction. First, MetLife must modify the application as approved by the president, vice president or secretary to verify that the parties have altered the agreement. Second, MetLife is then required to provide risk warnings to the policyholder once it knows that the policyholder is engaging in a replacement transaction.

15. From the repartee that ensued between the parties during oral argument on appeal and from

an examination of the record below, it appears that such discussion was occurring for the first time. This type of discourse should have transpired at the trial level.

16. When this matter is again before the circuit court, the mechanics of what documents and computer systems can be utilized to identify the class members, as redefined, needs to be thrashed out sufficiently to avoid further problems along this line.

court's decision to certify the class.[17] *See Catanzano*, 847 F.Supp. at 1078 (recognizing that decisions regarding certification are left to discretion of court) (*citing Shipes v. Trinity Indus.*, 987 F.2d 311, 316 (5th Cir.), *cert. denied*, 510 U.S. 991, 114 S.Ct. 548, 126 L.Ed.2d 450 (1993)). The decision to grant the writ of prohibition is solely predicated on our conclusion that the class and the mechanics for identifying its members should be defined in a more specific fashion so that policyholder names and information may be more readily obtained from MetLife. While we certainly could redefine the class, we hesitate to do so at this level based solely on oral representations. *See generally* Wright, *supra* § 1760 at 127–28 and cases cited therein (noting that court has discretion to redefine class in appropriate manner when class lacks requisite definiteness). When this case is again before the circuit court, the two-pronged definition of those individuals falling within the class that Plaintiffs outlined for this Court during oral argument could be utilized to redefine the class. *See Elliott*, 150 F.R.D. at 573–75 (defining class in terms of individuals who executed financing agreement providing for insurance but did not request life insurance before loan documents prepared and upholding definition of class in terms of presence or absence of documentary evidence).

Based on the foregoing, the writ of prohibition is hereby granted as moulded.

Writ granted as moulded.

---

17. We summarily reject MetLife's rejection that the class would not be manageable and that judicial economy would not be served through a class action, finding no merit to these positions.